Jack YELLEN, et al.

v.

### TELEDNE CONTINENTAL MOTORS, INC., et al.

Civil Action No. 11–3325.

United States District Court, E.D. Pennsylvania.

Dec. 6, 2011.

**492**

Arthur Alan Wolk, Bradley J. Stoll, Wolk & Genter, John Joseph Gagliano, The Wolk Law Firm, Philadelphia, PA, for Plaintiff.

Howard M. Klein, P. Connell McNulty, Conrad O'Brien, Philadelphia, PA, Matthew S. McHale, Walter P. Deforest, III, Deforest Koscelnik Yokitis Skinner & Berardinelli, Pittsburgh, PA, Will S. Skinner, Deforest Koscelnik Yokitis Skinner & Berardinelli, Woodland Hills, CA, Patrick E. Bradley, Sara Kennedy Kornbluh, Gary J. Ruckelshaus, Reed Smith LLP, Princeton, NJ, for Defendants.

### MEMORANDUM

DALZELL, District Judge.

This action arises from an aviation accident that killed Mark Yellen and Paula Moffett (collectively, the "decedents") on May 10, 2010 when they were flying in a privately owned aircraft. The plaintiffs, on behalf of their decedents—both apparently citizens of Tennessee [1]—commenced this wrongful death and survivor action in the Court of Common Pleas of Philadelphia County, Pennsylvania, docketed at May Term 2011, No. 000285 (hereinafter, the "state action").

Plaintiffs, as heirs to, or administrators of, the decedents' respective estates, alleged state law claims of strict liability, negligence, and breaches of express and implied warranties against eight defendants: (1) Teledyne Continental Motors, Inc. f/k/a Teledyne Continental Motors ("TCM, Inc."),[2] (2) Teledyne Technologies, Inc., (3) TDY Industries, Inc. a/k/a Teledyne Industries, Inc., (4) Allegheny Technologies Inc., (5) Allegheny Teledyne, Inc., (6) Cirrus Design Corp., (7) Cirrus Aircraft Corp., and (8) Cirrus Industries.[3] We will refer to defendants one through five as the "Teledyne defendants." Within this subgroup, defendants three through five are herein referred to as the "Pennsylvania defendants." Defendants six through eight comprise the "Cirrus defendants." One plaintiff, Paula Moffett's daughter—said to be a citizen of Virginia—asserts a personal claim of negligent infliction of emotional distress against all of the defendants.

On May 20, 2011, the Teledyne defendants, with the consent of the Cirrus de-

---

1. As will later become pertinent, their representatives under 28 U.S.C. § 1332(c)(2) take decedents' citizenship.

2. The caption on the docket incorrectly spells "Teledyne".

3. There is a discrepancy over the proper names for the Teledyne defendants in this case. Defendants assert that: (1) TCM, Inc. should have been sued as Continental Motors, Inc. ("CMI"), (2) Teledyne Technologies, Inc. should have been sued as Teledyne Technologies Incorporated, and (3) Allegheny Technologies, Inc. f/k/a Allegheny Teledyne Incorporated (incorrectly named as a separate defendant) should have been sued as Allegheny Technologies Incorporated. We adopt plaintiffs' nomenclature herein.

fendants, filed a Notice of Removal pursuant to 28 U.S.C. § 1446 invoking our federal question jurisdiction. Alternatively, those defendants also asserted that we have diversity of citizenship jurisdiction and contended that the Pennsylvania defendants were "fraudulently joined" to improperly trigger § 1441(b)'s prohibition against removal where at least one named defendant is a citizen of the forum state (the "forum defendant rule").

Pursuant to 28 U.S.C. § 1447(c), plaintiffs filed their motion to remand this litigation to the Court of Common Pleas of Philadelphia County. They contend that removal was improper because this Court lacks federal question jurisdiction and the forum defendant rule proscribes removal because the Pennsylvania defendants were not fraudulently joined. Also under § 1447(c), plaintiffs seek costs and fees incurred as a result of defendants' removal. Defendants oppose remand.

For the reasons detailed at length below, we will grant plaintiffs' motion to remand and award plaintiffs' their costs and fees reasonably incurred as a result of defendants' removal.

## I. *Factual Background*

■ In ruling on a motion to remand premised on alleged jurisdictional defects, "the district court must focus on the plaintiff's complaint at the time the petition for removal was filed ... [and] must assume as true all factual allegations of the complaint." *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir.1987) (citations omitted). Thus, we begin by reviewing the facts pertinent to

our jurisdictional analysis as they are presented in the *original* complaint.[4]

Plaintiffs allege that: "[a]t all times material [to the allegations set forth in the Complaint,] [the Pennsylvania defendants were] the Successor[s] and Real Part[ies] in Interest to the manufacturer of certain engine assemblies in the accident aircraft and, as such, assumed all responsibility for providing overhaul, repair, replacement, inspection, and other information with respect to the engine assembly." Pls.' Compl. ¶¶ 8–10. Plaintiffs also identify the Pennsylvania defendants as among "the designers" of the engine assemblies on the accident aircraft. *Id.* ¶ 11. The Pennsylvania defendants are alleged to maintain their principal places of business at 1000 Six PPG Place, Pittsburgh, Pennsylvania 15222. *Id.* ¶¶ 8–10.

Plaintiffs contend that Allegheny Technologies, Inc. and/or Allegheny Teledyne, Inc. (collectively the "Allegheny corporations") were formed as the result of a merger of Teledyne, Inc. (a predecessor corporation to the modern entities) and another Pennsylvania company. *Id.* ¶ 15. Plaintiffs assert that the Allegheny corporations owned Teledyne Industries, Inc. which, until 1999, included the then-unincorporated engine manufacturing division called Teledyne Continental Motors. *Id.* In 1999, the Allegheny corporations spun off Teledyne Continental Motors putatively to shed itself of Teledyne Continental Motors's liabilities given the Allegheny corporations' alleged knowledge of defects in the engines Teledyne Continental Motors man-

---

4. Soon after defendants removed plaintiffs' state action complaint to federal court, they filed motions to dismiss. Following the filing of these initial motions to dismiss, plaintiffs filed an amended complaint. Defendants mistakenly assert several removal arguments based upon the amended complaint filed

here, *see, e.g.,* Cirrus Defs.' Mem. of Law in Opp'n to Remand 7–8, and plaintiffs responded thereto. As the standard of review makes clear, we are obliged to limit our analysis to the original complaint. Thus, we need not address arguments related to the amended pleading.

ufactured. *Id.* Furthermore, the Allegheny corporations allegedly "concealed its knowledge of defects in the accident model engine and other substantially similar engines from regulatory authorities, the public, and Plaintiffs. As a result, the then existing engine defects perpetuated into subsequent manufactured engines." *Id.*

Plaintiffs further allege that the Pennsylvania defendants and the rest of the Teledyne defendants' "disregard of the corporate formalities, the co-mingling of corporate funds and resources, the disregard of corporate independence, and the joint venture nature of the Teledyne defendants' activities," renders them collectively liable for the tortious activities alleged in the Complaint. *Id.* ¶ 18.

Each of the four counts of the Complaint that apply to the Pennsylvania defendants [5] sounds in common law claims arising under the laws of the Commonwealth of Pennsylvania. The first count claims strict products liability against the Pennsylvania defendants as sellers and manufacturers of the allegedly defective engines. *Id.* ¶¶ 54–68. In count two, plaintiffs claim that the Pennsylvania defendants were negligent for, *inter alia*, designing the aircraft engine and its fuel delivery system and other components. *Id.* ¶¶ 69–74. The third count asserts that the Pennsylvania defendants breached express and implied warranties of the aircraft engines and its fuel delivery system as well as its other systems. In the seventh count, the daughter of one of the decedents asserts a claim of negligent infliction of emotional distress against all the named defendants, including the Pennsylvania defendants. *Id.* ¶¶ 119–127.

## II. *Analysis*

The federal removal statute, 28 U.S.C. § 1441(b), provides:

Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

We have already referred to this last sentence of the removal statute as the forum defendant rule. Section 1332(c)(1)'s definition of "citizen" is incorporated by reference into section 1441(b), and a corporation is a citizen "of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1).

Our Court of Appeals teaches that "[t]he removal statutes 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.'" *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990) (quoting *Steel Valley Auth.*, 809 F.2d at 1010). Generally speaking, a party "who urges jurisdiction on a federal court bears the burden of proving that jurisdiction exists." *Id.*

With this burden allocation in mind, we analyze the propriety of defendants' removal and so must first determine whether a removing defendant has carried its burden of showing that we indeed have federal question jurisdiction. If a defendant meets its burden, then we would have subject matter jurisdiction and removal would

---

5. In the four counts alleged against the Pennsylvania defendants they are a subset of the named defendant group. The Pennsylvania defendants are especially relevant to our jurisdictional analysis because their inclusion in this suit triggers the forum defendant rule.

be proper.[6] If, however, we were to find no federal question jurisdiction, we would then ask if any of the "parties in interest properly joined and served as defendants ... [are] citizen[s] of the State in which such action is brought[,]" § 1441(b) (quoting the forum defendant rule). If there are no properly joined and served forum defendants, then removal would be proper. If there are properly joined and served forum defendants, however, then removal would be improper and we must remand.[7] Thus, if even one defendant named in an action is a citizen of the forum state in which the action was initiated, the forum defendant rule mandates remand to state court. *Korea Exch. Bank, N.Y. Branch v. Trackwise Sales Corp.*, 66 F.3d 46, 48 (3d Cir.1995) (holding (1) operation of forum defendant rule waivable as procedural defect; and (2) action was not removable because defendants were citizens of New Jersey and case was originally filed in New Jersey state court).[8] Although our Court of Appeals has not yet extended the "fraudulent joinder" doctrine to alleged misuse of the forum defendant rule, the parties argue, and our foregoing reasoning finds *infra* section II.B.1, that the doctrine of fraudulent joinder may apply to block the forum defendant rule's operation.

Lastly, only if we find that there is neither a federal question nor a forum defendant would we be obliged to inquire into whether a defendant has met its burden of establishing diversity jurisdiction under 28 U.S.C. § 1332. In that case, if we were to find complete diversity, we would retain jurisdiction. But if we were to find incomplete diversity as to plaintiffs and all defendants, then we must remand unless the removing party can establish that a defendant was "fraudulently joined" so as to break complete diversity and deprive diverse parties of a federal forum. Our Court of Appeals has explicitly recognized fraudulent joinder in this diversity-breaking context. *In re Briscoe*, 448 F.3d 201 (3d Cir.2006).[9]

Remanding a case typically allows a state court to hear claims that arise under its own laws. Since "diversity jurisdiction

---

**6.** Some statutes expressly preclude removal of a federal question case if that case was first filed in state court. *See* Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and the Federal System* 392 n. 5, 812 n. 2 (6th ed. 2009). No such statutes are at issue here.

**7.** One commentator has noted that, in enacting the forum defendant rule, Congress determined that protection afforded by "diversity jurisdiction is [sometimes] unnecessary because there is less reason to fear state court prejudice against the defendants if one or more of them is from the forum state." Erwin Chemerinsky, *Federal Jurisdiction* § 5.5, at 357 (5th ed. 2005).

**8.** Once a case has been removed from state court, the federal district court must remand the case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). Our Court of Appeals has ex-

plained that " '[b]ecause lack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile, the removal statute should be strictly construed [when implicating questions of federal jurisdiction] and all doubts resolved in favor of remand.' " *Brown v. Francis*, 75 F.3d 860, 864–65 (3d Cir.1996) (quoting *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir.1985)); see also *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999) ("A presumption in favor of remand is necessary [when dealing with federal jurisdictional questions] because if a federal court reaches the merits of a pending motion in a removed case where subject matter jurisdiction may be lacking it deprives a state court of its right under the Constitution to resolve controversies in its own courts.").

**9.** Because we find that the forum defendants were not fraudulently joined, we need not reach the question of whether complete diversity exists here.

... trenches upon the jurisdiction of the state courts[,]" *McSparran v. Weist*, 402 F.2d 867, 876 (3d Cir.1968), we "cannot be expected to create new doctrines expanding state law," *Gill v. Gulfstream Park Racing Ass'n, Inc.*, 399 F.3d 391, 402 (1st Cir.2005), or "torture state law into strange configurations or precipitously ... blaze new and unprecedented jurisprudential trails." *Kotler v. Am. Tobacco Co.*, 926 F.2d 1217, 1224 (1st Cir.1990), *vacated on other grounds*, 505 U.S. 1215, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992). The forum defendant rule also reflects this conservative balance between the judicial power vested in state courts as opposed to federal ones.

Given this framework, we first ask whether removal is proper based on federal question jurisdiction.

### A. *Removal Premised on Federal Question*

Since this case does not raise an actionable federal question, we find defendants' removal to be improper.

#### 1. *The Defendants' Arguments*

Defendants allege that federal question jurisdiction arises in this litigation because plaintiffs' claims present such questions since they allege violations of the Federal Aviation Regulations ("FARs") in the context of aviation product liability. Cirrus Defs.' Mem. of Law in Opp'n to Remand 9; Teledyne Defs.' Mem. of Law in Opp'n to Remand 10–18. Defendants rely on *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir.1999), to contend that the FARs pertaining to Federal Aviation Administration ("FAA") engine certification trigger federal question jurisdiction in

claims alleging liability under state tort claims. Cirrus Defs.' Mem. of Law in Opp'n to Remand 6–8; Teledyne Defs.' Mem. of Law in Opp'n to Remand 11,14.

The Teledyne defendants argue that "[p]laintiffs have pled their complaint to raise the issue of whether the FAA acted properly in certifying the two engine series with respect to the [Pennsylvania] Defendants and what entity should be liable therefor, which is a sufficient federal issue over which this Court should exercise its jurisdiction. Federal law on FAA certification is therefore an 'essential element' of Plaintiffs' complaint, as pled." Teledyne Defs.' Mem. of Law in Opp'n to Remand 15.[10] The Teledyne defendants concede that "while the FAA is not a party to this action, it has a 'direct interest in the availability of a federal forum to vindicate its own administrative action[.]' "; *id.* 15–16 (quoting *Grable*, 545 U.S. at 315, 125 S.Ct. 2363).

The Teledyne defendants also read *Abdullah* to hold that Congress intended to rest " '*sole responsibility* for supervising the aviation industry with the federal government.' " *Id.* 16 (emphasis in original) (quoting *Abdullah*, 181 F.3d at 368). They argue that "[e]xercising federal jurisdiction over this complaint will ensure that this position of sole responsibility is respected." *Id.*

The Cirrus defendants raise similar arguments. They construe plaintiffs' argument as contending that defendants "breached standards of care set forth by federal law, and also impliedly allege that a federal agency ... breached its responsibilities in certifying and approving these products for sale in an allegedly defective

---

10. Specifically, they claim that "the complaint raises purely legal federal issues relating to (a) whether entities can be liable for supposedly erroneous engine certification ... as well as (b) whether entities which may have taken part in an FAA certification process ... are liable for later defects in performance of the engine." Teledyne Defs.' Mem. of Law in Opp'n to Remand 11; Defs.' Not. of Removal ¶ 58.

condition." Cirrus Defs.' Mem. of Law in Opp'n to Remand 8. They also allege that this litigation is about the FAA's "compatability with a federal statute (here, the FAA and FARs)" and the federal agency's "approval for sale and certification of the subject aircraft and its component engine[.]" *Id.* 9. The Cirrus defendants cite *Abdullah* for the proposition that FARs are "preemptive of any *state standards of care* in the field of aviation safety[,]" *id.* 10 (emphasis added), and conclude that "[f]or all of these reasons, this Court has subject matter jurisdiction over Plaintiff's claims." *Id.* 11.

## 2. *The Standard*

28 U.S.C. § 1441(b) allows a defendant to remove a civil action filed in state court if the federal district court has "original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States[,]" *see also* U.S. Const. art. III, §§ 1, 2, cl. 1. The Supreme Court in *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987), explained that the " 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint[,]" is the proper test to determine whether a suit "arises under" federal law for purposes of § 1331 and thus § 1441(b). This makes the plaintiff "the master of the claim" because it allows the plaintiff to "avoid federal jurisdiction by exclusive reliance on state law." *Id.* But the well-pleaded complaint rule is not the end of the inquiry. "[I]n certain cases federal-question jurisdiction will [also] lie over state-law claims that implicate significant federal issues," even if they are not raised directly. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545

U.S. 308, 312, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005) (citation omitted) (building upon *Merrell Dow Pharm., Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) and its progeny).

To determine if a case falls within *Grable's* more expansive federal question-eligible category, the Supreme Court has explained that courts are to inquire: "[1] does a state-law claim necessarily raise a stated federal issue, [2] [that is] actually disputed and substantial, [3] which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities[?]" *Id.* at 314, 125 S.Ct. 2363.

Justice Souter's majority opinion in *Grable* hinted that the grant of federal question jurisdiction in this posture would be "rare", *id.* at 315, 125 S.Ct. 2363, and commentators at the time emphasized the narrowness of the holding and observed that "[*Grable*] would not affect usual litigation." Chemerinsky, *supra,* § 5.2.3 at 295. The next Term, the Supreme Court in *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006), unequivocally confirmed this point and explained that *Grable* represents a "special and small category" of cases in which it "takes more than a federal element to open the 'arising under' door." *Id.* at 699, 701, 126 S.Ct. 2121 (quoting *Grable* ) (internal quotation marks omitted). Justice Ginsburg's majority opinion in *McVeigh* limited *Grable's* reach. She noted for the Court five factors that supported *Grable's* holding, namely that *Grable* "[1] centered on the action of a federal agency ... and [2] its compatibility with a federal statute, [3] the question qualified as 'substantial,' [11] and [4] its reso-

---

**11.** An issue is "substantial" if it "indicate[s] a serious federal interest in claiming the advantages thought to be inherent in a federal fo-

lution was both dispositive of the case and would be controlling in numerous other cases[,]" and it [5] "presented a nearly 'pure issue of law' ". *Id.* at 700, 126 S.Ct. 2121. *See also Kalick v. Northwest Airlines Corp.*, 372 Fed.Appx. 317, 320 (3d Cir.2010) *(per curiam).*

■ In the context of aviation litigation, our Court of Appeals's reasoning in *Abdullah* informs our analysis of the second and third factors that *McVeigh* seven years later identified. *Abdullah* held that:

> Even though we have found federal preemption of the standards of aviation safety, we still conclude that the *traditional state and territorial law remedies continue to exist for violation of those standards.* Federal preemption of the standards of care can coexist with state and territorial tort remedies.

181 F.3d at 375 (emphasis added). Following the Supreme Court's holding in *McVeigh,* our Court of Appeals has expressly acknowledged *Abdullah'*s continued vitality. *See Elassaad v. Independence Air, Inc.,* 613 F.3d 119, 125 (3d Cir.2010) ("[W]e held [in *Abdullah* ] that state common law remedies were still available to the injured passengers based on the specific language of the Aviation Act's savings and insurance clauses."). Thus, state common law remedies remain available in the aviation context even if the applicable standard of care is imported from the federal regulatory regime. *See* John D. McClune, *There is no Complete, Implied, or Field Federal Preemption of State Law Personal Injury/Wrongful Death Negligence or Product Liability Claims in General Aviation Cases,* 71 J. Air L. & Comm. 717, 730 n. 63 & accompa-

nying text (2006) (*"Abdullah* . . . does not apply to general aviation product liability, negligence, breach of warranty, and failure to warn cases."). Thus, making a "federal question case" out of an aviation accident requires something more than simply importing a federal standard of care.

### 3. *Application*

■ Defendants unavailingly attempt to "squeeze[ ] . . . [this litigation] into the slim category *Grable* exemplifies," *McVeigh,* 547 U.S. at 701, 126 S.Ct. 2121, by recasting plaintiffs' complaint as a challenge to the FAA, the Federal Aviation Act, or FARs. Defendants, however, are unable to muster a reference to one paragraph in the original complaint in which plaintiffs allegedly launch, expressly or impliedly, an attack on the FAA, the Federal Aviation Act, or FARs.[12]

*McVeigh* is fatal to defendants' arguments. The Supreme Court in *McVeigh* found that no "federal case" existed when the litigation centered on a "[fact-bound, situation-specific] reimbursement claim [that] was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court, and the bottom-line practical issue is the share of that settlement properly payable to [the insurer] [,]" *id.* at 700, 126 S.Ct. 2121 (internal citations omitted), where the payment depended on a *"contract-derived claim"* governing the insured's obligation to reimburse the insurer. *Id.* at 688, 126 S.Ct. 2121 (emphasis added). In so holding, the Supreme Court found state courts to be the proper fora to hear common law "contract-derived" claims that were initi-

rum[.]*" Grable,* 545 U.S. at 313, 125 S.Ct. 2363.

12. We note with some amusement that, unlike typical motion to dismiss practice, defendants

in opposing remand ask us to read *more* facts and allegations into the complaint than actually appear in that pleading.

ated by one private party against another private party, even where federal laws played a role in the background. *Id.* at 683, 700–01, 126 S.Ct. 2121.

This litigation is no different from *McVeigh.* First, defendants admit (as they must) that we have only private litigants. Second, the claims pled in the original complaint *all* sound in state law and allege that airplane and engine designers, testers, manufacturers, installers, and assemblers breached duties under theories of product liability, negligence, and negligent infliction of emotional distress, in addition to express and implied warranties. Since our Court of Appeals explicitly bifurcated "standards of aviation safety" from the "traditional state and territorial law remedies ... for violation[s] of those standards," *Abdullah,* 181 F.3d at 375, Pennsylvania law applies to aviation accident cases even if the relevant standard of care is imported from the federal regulatory regime.[13]

Third, though these claims arise against the backdrop of a federal aviation regulatory scheme, they sound in run-of-the-mill state tort law. Plaintiffs' claims do not betray a serious federal interest that merits a federal forum in this litigation. It is a fundamental premise of our federal system that state courts are "competent to apply federal law, to the extent it is relevant[.]" *McVeigh,* 547 U.S. at 701, 126

S.Ct. 2121; *see Tafflin v. Levitt,* 493 U.S. 455, 467, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (state courts competent to hear federal causes of action); *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 478, n. 4, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981); *see also* Fallon et al., *supra* n. 4 at 392. Furthermore, state courts routinely apply standards of care in tort cases. This litigation fits comfortably within the state courts' realm of expertise, and if we were to retain the case we would run afoul of the "division of labor between state and federal courts" as Congress and the Supreme Court envisioned it. *See Grable,* 545 U.S. at 310, 313, 125 S.Ct. 2363.

Fourth, we fail to see, and defendants do not convince us otherwise, that resolution of the non-jurisdictional "questions" in this litigation would be controlling in other instances. Defendants bear this burden, but the yoke here proves too heavy for them mainly because the fifth and final *McVeigh* factor demonstrates that this fatal aviation accident case is inherently fact-intensive. The defendants' submissions, for example, devote many pages to detailing corporate histories that they claim are relevant to identifying which entities are truly exposed to tort liability. These questions alone raise issues of contract interpretation that fall within the powers and expertise of state courts and vary depending upon the parties litigating the issue.

---

**13.** Though defendants acknowledge *Abdullah'*s holding that the federal standard of care preempts state standards of care in certain sectors of the aviation industry, they overlook an essential link in the chain from that holding to the one they assert should apply here: that *any* state law claim adopting a federal standard of care automatically triggers federal question jurisdiction. Defendants improperly conflate the "standard of care" and "state law remedies" distinction. Teledyne defendants lean on *Abdullah'*s "sole responsibility" language to support this notion, but they ignore the opinion's bifurcating lan-

guage. And while the Cirrus defendants' submission contains a heading that reads "Plaintiffs' State Law Claims Are Preempted By The FAA and Regulations Promulgated Thereunder, Under Which Federal Jurisdiction Arises[,]" their argument is only confined to a discussion of preemption of the "federal standard of care." Despite the label, the substance of the Cirrus defendants' submission reflects the limits of *Abdullah'*s reasoning and their own position. Thus, we reject defendants' indiscriminate melding of the standard of care with the available remedial source.

**500**

Thus, defendants cannot demonstrate that the claims contained in plaintiffs' original complaint satisfy any of the *McVeigh* factors necessary to qualify the claims for *Grable*'s federal question status. Defendants also fail to show that plaintiffs' well-pled complaint alleges any facial basis for federal question jurisdiction.

The Seventh Circuit's persuasive reasoning in *Bennett v. Southwest Airlines Co.*, 484 F.3d 907 (7th Cir.2007) (Easterbrook, J.), presents the final nail in this coffin. *Bennett* applied the *Grable* line of cases to a scenario quite similar to what we have here. *Bennett* was an appeal of a district court's denial of a remand for a complaint originally filed in state court by aircraft passengers and bystanders against a large commercial airline company, commercial aircraft manufacturer, and the City of Chicago alleging state law claims of negligence, conscious disregard for safety, and product liability. The aircraft at issue overran the runway at Chicago's Midway International Airport causing it to smash through a barrier and a fence before finally stopping on a street where it crushed a car and killed one of the occupants. *Id.* at 908.

In finding no federal question jurisdiction for state law claims arising in the aviation accident context, Judge Easterbrook for the panel commented on *Grable* and its progeny:

> The Supreme Court thought it significant in *Grable* that only a few quiet-title actions would present federal issues. That enabled the Court to conclude that its decision would not move a whole category of litigation to federal court or upset a balance struck by Congress. Things are otherwise with air-crash litigation: [a finding of federal question

jurisdiction] would move a whole category of suits to federal court. And it would upset a conscious legislative choice—not one made in § 1331, perhaps, but surely the one made when 28 U.S.C. § 1369[14] was enacted in 2002. That statute permits suit in federal court when a single air crash (or other disaster) leads to at least 75 fatalities and minimal diversity is present. Those lines would be rendered meaningless if ... every aviation case is federal. Section 1369 makes sense only if transportation disasters are litigated in state court unless they satisfy the new statute's terms.

484 F.3d at 911 (footnote added). Judge Easterbrook cited our Court of Appeals's reasoning in *Abdullah* because it "strongly implies that the "arising under" jurisdiction is unavailable[.]" *Id.* at 912. We agree and, like the Seventh Circuit, "hold that this is the right conclusion." *Id.* Thus, we find no federal question jurisdiction to warrant removal.

We turn next to the question of whether the statutory forum defendant rule makes defendants' removal improper.

**B.** ***"Fraudulent Joinder" As Basis For Removal to Counter Forum Defendant Rule***

As earlier noted, removal is improper if any of the "parties in interest properly joined and served as defendants ... [are] citizen[s] of the State in which such action is brought." 28 U.S.C. § 1441(b). If even only one defendant named in the action is a citizen of the forum state where the action was initiated, the forum defendant rule in § 1441(b) obliges us to remand the action to state court.

14. Because we decide this motion to remand on other grounds, we do not reach this stat- ute's applicability here.

Though defendants [15] contend that the Pennsylvania defendants were "fraudulently joined" so as to defeat the defendants' statutory rights of removal, they mistakenly assume that we must apply the fraudulent joinder doctrine in this context. It will be recalled that the decedents were citizens of Tennessee and all defendants are of diverse citizenship to Tennessee.[16] To our knowledge, our Court of Appeals has never applied the doctrine when the allegedly fraudulently-joined defendant is a forum defendant whose presence in the suit triggers the removal statute's forum defendant rule *without* compromising the parties' complete diversity. Thus, we construe the parties' fraudulent joinder arguments to beg the question of whether the fraudulent joinder doctrine should be extended to the forum defendant rule context.

Consequently, we must first determine if the doctrine applies at all to the forum defendant rule. Surprisingly, we find it *does* apply and find support for this position in our Court of Appeals's reasoning two years ago in *Brown v. JEVIC*, 575 F.3d 322 (3d Cir.2009).

### 1. *Our Court of Appeals's Fraudulent Joinder Jurisprudence*

Our Court of Appeals summarized its fraudulent joinder jurisprudence in *In re Briscoe*, 448 F.3d 201 (3d Cir.2006):

For a removal predicated upon diversity of citizenship, a proper exercise of federal jurisdiction requires satisfaction of the amount in controversy requirement as well as complete diversity between the parties, that is, every plaintiff must be of diverse state citizenship from every defendant.

The doctrine of fraudulent joinder represents an exception to the requirement that removal be predicated solely upon complete diversity. In a suit with named defendants who are not of diverse citizenship from the plaintiff, the diverse defendant may still remove the action if it can establish that the nondiverse defendants were "fraudulently" named or joined solely to defeat diversity jurisdiction.... [T]his court has held that *joinder is fraudulent if "there is no reasonable basis in fact or colorable [17] ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment."* If the district court determines that the joinder was "fraudulent" in this sense, the court can "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." If, however, the district court determines that it does not have subject-matter jurisdiction over the

---

15. The Cirrus defendants consented to the Notice of Removal and they explicitly "incorporate[d] by reference [the Teledyne defendants] opposition to Plaintiffs' motion to remand as it relates to fraudulent joinder." Cirrus Defs.' Mem. of Law in Opp'n to Remand 12. Consequently, we will refer to both sets of defendants collectively unless otherwise noted.

16. The plaintiff asserting the personal claim is said to be from Virginia, and all defendants are of diverse citizenship to Virginia.

17. A ground is *colorable* if it "appear[s] to be true, valid, or right." *Black's Law Dictionary* 301 (9th ed. 2009). As our Court of Appeals has noted, and the definition of *colorable* suggests, the fraudulent joinder inquiry does not require us to render a merits determination. We must only decide if—based on the law and facts—it appears *possible* that a claim could be asserted against a defendant. We need not inquire into the sufficiency of the pleadings, nor do we conduct a full-blown summary judgment analysis.

removed action because the joinder was not fraudulent, it must remand to state court [if no other basis for subject matter jurisdiction exists]. If warranted, the district court's "order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."

*Id.* at 215–16 (emphasis added) (citations omitted) (footnote added).

*In re Briscoe* demonstrates that before our Court of Appeals's opinion in *JEVIC,* courts in our circuit found fraudulent joinder *only* where a defendant's joinder was allegedly invoked to defeat the complete diversity requirement. The limited reach of the fraudulent joinder doctrine was consistent with the support that our Court of Appeals relied upon when it rendered some of its earlier fraudulent joinder decisions, starting with *Abels v. State Farm Fire & Cas. Co.,* 770 F.2d 26 (3d Cir.1985). If we trace fraudulent joinder's jurisprudential lineage, our Court of Appeals adopted its standard from *Goldberg v. CPC International,* 495 F.Supp. 233, 239 (N.D.Cal.1980). *Goldberg* in turn took its support from *Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921) ("this right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy"),[18] which itself cited *Wecker v. National Enameling and Stamping Co.,* 204 U.S. 176, 185–86, 27 S.Ct. 184, 51 L.Ed. 430 (1907). These three cases dealt exclusively with an allegation that the plaintiff joined a defendant to destroy complete diversity. *Goldberg,* 495 F.Supp. at 236 (applying fraudulent joinder in case where "[c]omplete diversity exist[ed] between plaintiffs and the named defendants. Some of the [Doe defendants], however, [we]re alleged to be residents of or entities organized under the laws of California. If they [we]re treated as parties, diversity of citizenship [would be] destroyed."); *Wilson,* 257 U.S. at 94, 42 S.Ct. 35 (applying fraudulent joinder in case where "plaintiff and [defendant] employer were citizens of different states, the former of Alabama and the latter of New Jersey ... [but joined defendant] coemployé was a citizen of Alabama, and was wrongfully and fraudulently joined as a defendant with the sole purpose of preventing a removal"); *Wecker,* 204 U.S. at 178–180, 27 S.Ct. 184 (applying fraudulent joinder where plaintiff sought remand "on the ground that there was not in the case a controversy between citizens of different states," where the Court's reasoning strongly implies plaintiff was citizen of Missouri and the allegedly fraudulently joined defendant was also a citizen of Missouri). Thus, none of these foundational cases touched upon the issue presented here: whether the plaintiffs fraudulently joined the Pennsylvania defendants to improperly trigger § 1441(b)'s forum defendant rule. Additionally, neither party points to any case where a court directly addresses this question.[19]

18. The Cirrus defendants cite this exact language, but our analysis shows why these defendants take these words out of context and do not necessarily apply as they—and plaintiffs, for that matter—assume they do.

19. Our research unearthed one district court opinion that applies fraudulent joinder to facts analogous to those now here before us. In *Long v. Long,* 509 F.Supp.2d 568 (N.D.W.Va.2007), the court granted plaintiff's motion to remand where defendants' removal was premised on diversity. The court found that although complete diversity existed, two of the named defendants were citizens of West Virginia and were not fraudulently joined, thus § 1441(b)'s forum defendant rule obliged the court to remand. *Long* rehearsed the standard required to "establish that a *non-diverse* defendant has been fraudulently joined in an attempt to defeat removal," *Id.* at

Nevertheless, our Court of Appeals recently expanded fraudulent joinder's reach. In *JEVIC*, Judge Hardiman explained for the Court that:

> Although this appeal does not involve a plaintiff that fraudulently named a non-diverse party to defeat diversity jurisdiction, the principle enunciated in *In re Briscoe* applies with equal force to the facts of this case. It was plainly improper for [plaintiff] to sue [debtor defendant] in state court after [debtor defendant] had filed for bankruptcy protection. To the extent [debtor defendant's] status as a debtor not subject to removal deprived [other removal-eligible defendants] of a federal forum to which they were otherwise entitled, [plaintiff's] joinder of [debtor defendant] was fraudulent.

575 F.3d at 327.

█ We think our Court of Appeals's willingness in *JEVIC* to extend the fraudulent joinder doctrine warrants our doing so here. The fraudulent joinder line of cases distills to a simple principle: a court cannot permit a plaintiff to join a straw-man defendant solely to deprive removal-eligible defendants of a federal forum to which they are otherwise entitled. *In re Briscoe* and its antecedents foreclose plaintiffs from improperly impairing complete diversity to shield itself from removal. *JEVIC* forecloses a plaintiff's capacity to use federal bankruptcy law to immunize itself against removal. In like manner, we see no reason why a plaintiff should not be foreclosed from improperly invoking the forum defendant rule to shield itself from removal. Thus, the fraudulent joinder

doctrine applies here. We will thus draw upon our Court of Appeals's jurisprudence on this subject as we extend the doctrine to the forum defendant rule.

### 2. *Fraudulent Joinder Mechanics: Defendants' Burden*

█ The removing party has a " 'heavy burden of persuasion' " to prove that a plaintiff has fraudulently joined a party to destroy complete diversity. *Boyer*, 913 F.2d at 111 (quoting *Steel Valley Auth.*, 809 F.2d at 1012 n. 6). One commentator has noted that "[a] contention that the plaintiff has engaged in fraudulent joinder must be asserted with particularity by the party seeking removal, and supported by clear and convincing evidence." Charles Alan Wright et al., *Federal Practice and Procedure*, § 3723 & text accompanying nn. 104–105 (4th ed. current through 2011 update); *see, e.g., DiMichelle v. Sears & Roebuck Co.*, No. 97–6470, 1997 WL 793589, at *2 (E.D.Pa. Dec. 5, 1997) (Weiner, J.).

To meet this burden, a removing defendant may support its notice of removal with "evidence outside the pleadings, including such supporting documents as affidavits and deposition transcripts, in defendant's attempt to satisfy its burden of establishing fraudulent joinder." Wright et al., *supra*, § 3723 n. 107 & accompanying text (citing *In re Briscoe*, 448 F.3d 201 (3d Cir.2006)). Our Court of Appeals has allowed *limited* piercing of the complaint's allegations, and was at pains to stress that this inquiry is "far different from the summary judgment type inquiry." See *Boyer*, 913 F.2d at 112.[20]

572 (emphasis added), but without further explanation applied the standard to a situation where a *diverse* defendant was alleged to be fraudulently joined.

**20.** Defendants' notice of removal misapprehends our Court of Appeals's clear teaching on the remand standard. Defs.' Not. of Removal ¶¶ 30–31. Despite defendants' invocation of the motion to dismiss standard, we do *not* apply this standard to a remand inquiry.

In *Boyer*, our Court of Appeals identified *Smoot v. Chicago, Rock Island & Pacific R.R. Co.*, 378 F.2d 879 (10th Cir. 1967), as a model for limited piercing of allegations to discover fraudulent joinder. In *Smoot*, the Tenth Circuit noted that limited piercing "does not mean that the federal court will pre-try, as a matter of course, doubtful issues of fact to determine removability; the issue must be capable of summary determination and be proven with complete certainty." *Id.* at 882 (internal quotation marks omitted) (emphasis added). The *Smoot* plaintiff's complaint advanced a negligence claim against a railroad employee whose joinder destroyed complete diversity. When the railroad removed to federal court on fraudulent joinder grounds, it argued that the railroad employee was not an employee and agent of the railroad at the time alleged in the complaint. In support thereof, the railroad attached the named employee's affidavit in which he swore that the railroad had terminated him "almost fifteen months before the collision", *id.* at 881; thus, he could not have been "connected with the acts attributed to him." *Id.* Moreover, plaintiff did not deny the allegations of the affidavit. The Tenth Circuit held that "[t]he non-liability of [the employee] having been established with complete certainty upon undisputed evidence, it was then subject to summary determination[.]" *Id.* at 882.

### 3. *Defendants' Arguments*

The Teledyne defendants devote considerable attention to the fraudulent joinder issue. They attack the joinder on two grounds. They contend in both the Notice of Removal and their Response in Opposition to Plaintiffs' Motion to Remand that (1) no viable cause of action exists against the Pennsylvania defendants, and (2) no reasonable basis in fact or colorable ground supporting the claim against the Pennsylvania defendants exists because the Pennsylvania defendants allegedly ceded all liability to other entities pursuant to subsequent asset and liability transfer agreements and corporate reorganizations.

■ As will be seen, defendants fail to carry their "heavy burden" of showing that the Pennsylvania defendants were fraudulently joined. Specifically, under the facts in the record that we reviewed for our inquiry, defendants' failed to show that (1) plaintiffs' negligent design claim against non-manufacturing, non-selling defendants is *not* viable under Pennsylvania law, and (2) there is "no reasonable basis in fact or colorable ground" in support of plaintiffs' negligent design claim.[21]

### a. *The Viability of the Cause of Action*

#### (1) *Defendants' Argument*

The Teledyne defendants assert that:

[S]ince there is no valid cause of action against a defendant that allegedly designed an engine many years ago, but no longer owns the business and, in fact, ceased owning the business almost six years before the engine was manufactured or sold—the joinder is fraudulent.... There is no liability under the causes of action asserted by Plaintiffs against an entity that neither manufactured nor sold the engine in question.

Teledyne Defs.' Mem. of Law in Opp'n to Remand 5; *see also* Defs.' Not. of Removal

---

**21.** Even if fraudulent joinder were not applicable in the forum defendant rule context, defendants' argument still fails. Plaintiffs' complaint identifies TDY, Allegheny Technologies, and Allegheny Teledyne as corporations that maintain their principal places of business at 1000 Six PPG Place, Pittsburgh, *Pennsylvania* 15222. Pls.'s Compl. ¶¶ 8–10. On these facts alone, the removal statute's plain language would oblige us to remand this case. *See Trackwise Sales Corp.*, 66 F.3d at 48.

¶¶ 52–55. The Teledyne defendants further argue that "the allegations of negligent design against TDY Industries, Inc. do not establish a colorable legal cause of action in the first place against an entity that did not manufacture or sell the engine[.]" Teledyne Defs.' Mem. of Law in Opp'n to Remand 5.[22] In fact, they assert that "Plaintiffs have cited no decision from Pennsylvania (or any other court) where a defendant that did not manufacture or sell an engine was held liable for a design defect regarding that engine . . . . [instead plaintiffs cite *Cox v. Shaffer*, 223 Pa.Super. 429, 302 A.2d 456 (1973) (*per curiam*)] which acknowledge[s] the existence of liability for a design defect *of a defendant which manufactured and sold the allegedly defective engine*". *Id.* at 8 n. 5 & accompanying text (emphasis in original).

The Teledyne defendants also contend that Pennsylvania state law and Restatement (Second) of Torts § 402A forecloses strict products liability claims and those alleging breaches of express and implied warranties against a party that is neither a manufacturer nor a seller. *Id.* 6–7; Defs.' Not. of Removal ¶¶ 53–54.

### (2) *Application*

Defendants' contention that plaintiffs have not asserted a viable negligent *design* claim against the Pennsylvania defendants does not persuade. As an initial matter, the Teledyne defendants misapprehend which party in this litigation bears the burden of showing that there is "no reasonable basis in fact or colorable ground supporting the claim against the joined defendants." While it may be true that plaintiffs do not cite a source of Pennsylvania law where a non-manufacturer or seller is found to be liable for a design defect, the onus is not on *plaintiffs* to prove this point. To the contrary, defendants bear the burden of showing that a non-manufacturer or non-seller is free of liability because *removing defendants* have the burden of showing that removal is proper on fraudulent joinder grounds. See *Boyer*, 913 F.2d at 111. The case law and the fraudulent standard's plain language impose defendants' burden, as only defendants have the motivation to show that "no reasonable basis in fact or colorable ground" exists.

Second, *Cox v. Shaffer*, 302 A.2d at 457,[23] recognizes negligent design liability under Pennsylvania law so long as "defendant knew or should have known of the defect." Defendants' submission mistakenly conflates Pennsylvania's strict products liability and negligent design defect jurisprudence. The Superior Court of Pennsylvania has recently stated that "[p]ursuant to Pennsylvania law, a negligent design defect claim is considered to be distinct from, and not subsumed within, a strict liability design defect claim." *Lance v. Wyeth*, 4 A.3d 160, 166 (Pa.Super.Ct.2010). Defendants correctly note that Pennsylvania only holds manufacturers and sellers strictly liable under a theory of *products liability*, but neither Pennsylvania law nor defendants' arguments mandates that the same also holds under a negligent design defect theory. *See id. Lance* only states that the Pennsylvania

---

**22.** Because we decide this litigation on another basis, we need not reach defendants' argument refuting plaintiffs' "alter-ego" liability theory.

**23.** Plaintiffs specifically allege that at least one of the Pennsylvania defendant's knowledge of this defect motivated the defendants' corporate reorganizations. *See, e.g.*, Pls.'

Compl. ¶ 15 ("due to the knowledge of defects in engines manufactured by TCM and its growing liabilities, the Allegheny Teledyne companies spun off TCM purportedly to shed itself of liabilities" and "Allegheny concealed its knowledge of defects in the accident model engine and other substantially similar engines").

Supreme Court expressly adopted The Restatement (Second) of Torts § 402A's endorsement of strict products liability against sellers. Though *Lance* observes that § 395 addresses negligent design liability against manufacturers, the Superior Court did not state that the Pennsylvania Supreme Court expressly adopted § 395 (pertaining to negligent design liability against manufacturers). Nor does *Lance,* or any other Pennsylvania opinion that we have found, hold § 395 to be the final word on the Commonwealth's negligent design liability law.

Though defendants are correct that *Cox* holds a builder/manufacturer liable under the facts of that case, we cannot agree that the court's finding of builder/manufacturer liability logically precludes non-manufacturer or non-seller liability. There is no reasoning in *Cox* to suggest such an outcome, and our review of the *Summary of Pennsylvania Jurisprudence* suggests that the opposite conclusion is correct: "A duty of care extends to designers of a product which have *no part* in the actual manufacture of that product and to designers and manufacturers of the process by which a product is manufactured." 3A *Summary of Pennsylvania Jurisprudence Torts* § 41:176 (2d ed. current through October 2011) (emphasis added). Taking our cue from page nine of the Teledyne defendants' Response in Opposition to plaintiffs' motion to remand, we will refrain from "creat[ing] new doctrines expanding state law," *see Gill,* 399 F.3d at 402, nor will we "tortur[e] state law into strange configurations or precipitously . . . blaze new and unprecedented jurisprudential trails". Indeed, we believe precisely such outcomes could follow if we accepted defendants' construction of Pennsylvania

negligent design defect tort liability. *See Kotler,* 926 F.2d at 1224; Teledyne Defs.' Mem. of Law in Opp'n to Remand 9.[24]

### b. The "Ceded All Liability" Contention

#### (1) Defendants' Argument

The Teledyne defendants argue that the Pennsylvania defendants ceded all of their liability to other entities through a complex history of asset and liability transfer agreements and corporate reorganizations, such that "[n]one of the [Pennsylvania] Defendants had any association with TCM[, Inc.] at the time the engine in question was manufactured and sold." Defs.' Not. of Removal ¶¶ 36–51. This attempt to shoehorn this case into the *Smoot* footprint will not work.

In support of their "no liability" argument, defendants rely upon Ms. Melanie S. Cibik's declaration. Cibik is the Vice President, Associate General Counsel, and Assistant Secretary for Teledyne Technologies Incorporated. Based upon her personal knowledge and review of business records, she opines that in 1999 Teledyne Technologies Incorporated:

> [A]cquired the assets and liabilities of Teledyne Continental Motors—Piston Engines[, an unincorporated subdivision of one of the Pennsylvania defendants, pursuant to the terms of a Separation and Distribution Agreement]. As part of that transaction, Teledyne Technologies Incorporated assumed responsibility for liabilities of general aviation piston engines production by Teledyne Continental Motors when it was part of Teledyne Industries, Inc. (one of the [Pennsylvania] Defendants).

**24.** Because we find plaintiffs are not precluded from asserting a negligent design claim against the Pennsylvania defendants, we do not reach the viability of plaintiffs' strict products liability, breach of express and implied warranties, and negligent infliction of emotional distress claims against the Pennsylvania defendants.

Cibik Decl. ¶ 9. Then, in 2001, Teledyne Technologies Incorporated's Teledyne Continental Motors—Piston Engines division's assets were transferred to TCM, Inc. and TCM, Inc. assumed all "responsibility for the potential liability of the former Teledyne Continental Motors–Piston Engines division arising from the operation of the business[,]", "including but not limited to any liabilities that may have arisen before December 1999[.]" *Id.* ¶ 12. Following this transaction, and pursuant to a December 11, 2010 Purchase Agreement, "Teledyne Technologies Incorporated completed the sale of all issued and outstanding capital stock of Teledyne Continental Motors, Inc. ... to Technify Motor (USA) Inc. [on April 19, 2011]". *Id.* ¶ 14. Soon thereafter, TCM, Inc. changed its name to Continental Motors, Inc. ("CMI"), and "CMI retained all liabilities for any aviation *product liability* claims asserted against CMI before or after the sale that occurred on April 19, 2011." *Id.* (emphasis added).

## (2) *Application*

First, it is difficult to reconcile the Teledyne defendants' similar, but significantly divergent, statements in their Notice of Removal and Memorandum of Law in Opposition to Remand.[25] In the Notice of Removal, defendants allege that CMI retained all "aviation product liability claims" exposure brought against itself before and after a certain date, but in their subsequent statement they allege that CMI retained all "aviation liability claims," generally. If the defendants cannot assert with any degree of consistency which liabilities CMI retained (and, by implication, which liabilities may or may not have remained with the Pennsylvania defendants), *we* cannot come to a *Smoot*-like conclusion that there is "no reasonable basis in fact or colorable ground supporting" plaintiffs' claims against the Pennsylvania defendants.

Second, if we pierce plaintiffs' allegations *á la Smoot,* we find that the Teledyne defendants' reliance on the Cibik Declaration fails to foreclose the Pennsylvania defendants' liability with any degree of certainty. One can hardly characterize plaintiffs as leaving these factual allegations unchallenged as they were in *Smoot.* Pls.' Mot. to Remand 5 ("As for TDY ... [one of the Pennsylvania defendants], it is the corporate entity directly responsible in tort for the negligent design of the IO–550–N engine[.]").[26] Unlike the plaintiff in *Smoot,* plaintiffs here indeed contest the Cibik Declaration and the Teledyne defendants' assertion that the Pennsylvania defendants retain no liability.

**25.** *Compare* Defs.' Not. of Removal ¶ 55 (emphasis added) ("CMI retained all liabilities for *any aviation product liability claims asserted against CMI* before or after the sale that occurred on April 19, 2011.... CMI has assumed any and all liabilities asserted by Plaintiffs in this case against TCM[, Inc.], Teledyne Technologies Incorporated and the [Pennsylvania] Defendants whether Plaintiffs' claims are based on strict liability, negligence, breach of express or implied warranties, or negligent infliction of emotional distress") *with* Teledyne Defs.' Mem. of Law in Opp'n to Remand 8 (emphasis added) (citing Cibik Decl. ¶¶ 12, 14) ("CMI retained all liabilities for *any aviation liability claims arising from* the operation of Teledyne Continental Motors before or after the sale that occurred on April 19, 2011.... CMI has assumed any and all liabilities asserted by Plaintiffs in this case against TCM[, Inc.], Teledyne Technologies Incorporated, and the [Pennsylvania] Defendants whether Plaintiffs' claims are based on strict liability, negligence, breach of express or implied warranties, or negligent infliction of emotional distress.").

**26.** *The Oxford English Dictionary* defines *responsible* as "liable to be called to account." XIII *The Oxford English Dictionary* 742 (2d ed. 1989).

Cibik's own words preclude us from holding that the Pennsylvania defendants have no liability exposure. At best, Cibik's statements are ambiguous about what liabilities were and were not transferred. It is by no means clear what the locution "liabilities of general aviation piston engines production" includes or excludes. Rather to the point, the language does not resolve where negligent design liability is included within this "production" category.

Furthermore, the two subsequent liability transfer transactions appear to be premised on this initial liability transfer. Thus, analyzing these later transactions sheds little light on what, if any, liability remains with the Pennsylvania defendants. Nevertheless, Cibik's statements on these subsequent transactions are similarly ambiguous about what liabilities were and were not transferred when TCM, Inc. assumed "liability . . . arising from the operation of the business." In addition, Cibik's concluding remark by strong implication leaves the door open for plaintiffs' contention that the Pennsylvania defendants retain tort liability for negligent design. She declares only that "CMI retained all liabilities for any aviation *product liability* claims." As our analysis above shows, product liability and negligent design are distinct sources for tort liability under Pennsylvania law. Thus, Cibik's statement undermines defendants' contention that the Pennsylvania defendants ceded *all* their negligent design liability. Based on Cibik's Declaration, we cannot "establish with complete certainty upon undisputed evidence" that the Pennsylvania defendants have no liability exposure under a theory of negligent design. *See Smoot*, 378 F.2d at 882.

### C. *Plaintiffs' Request for Fees and Costs*

■ Lastly, plaintiffs urge us to award them the fees and costs they incurred as a result of defendants' removal. The removal statute provides that a remand of a case to state court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). Our Court of Appeals in *Mints v. Educational Testing Service*, 99 F.3d 1253, 1260 (3d Cir.1996), held that "a district court has broad discretion and may be flexible in determining whether to require the payment of fees under section 1447(c)." The removal need not have been improvident or in bad faith to justify an award of fees. *Id.*

The Supreme Court has elaborated on the standard we are to apply, holding that:

> [T]he standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied.

*Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005). The Court also explained that this standard "recognize[s] the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress'[s] basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied." *Id.* at 140, 126 S.Ct. 704.

Defendants collectively had no objectively reasonable basis for seeking removal here. Defendants' federal question arguments ignore our Supreme Court's teaching in *McVeigh*. Their notice of removal and subsequent filings mischaracterize plaintiffs' complaint as challenging the FAA, the Federal Aviation Act, and FARs,

and fail to identify a single paragraph in the original complaint to substantiate these contentions. Defendants also ascribe no significance to the fact that this litigation involves purely private parties. Defendants ignore our Court of Appeals's separation of the applicable standard of care owed in the aviation context from the continued viability of traditional state law remedies.

Defendants' fraudulent joinder arguments repeatedly and mistakenly conflate Pennsylvania law's strict product liability and negligent design liability, leading them to misstate Pennsylvania law. They misconstrue the removal burden allocation and argue that plaintiffs, and not they, have the duty to prove that removal was proper. Defendants' allegation-piercing arguments also rely upon a Declaration that is riddled with inconsistencies and ambiguities that preclude us from a *Smoot*-like finding that the Pennsylvania defendants themselves retain no liability.

Given defendants' lack of an objectively reasonable basis to remove this action, we find it all the more surprising that the two different sets of defendants actually have endorsed each other's submissions in this matter. Defendants' lack of objective evaluation of each other's submissions prolonged this litigation and imposed costs both on the opposing parties and on themselves.

Thus, the Order accompanying this Memorandum will oblige plaintiffs to promptly file a fee petition accounting for "just costs and any actual expenses, includ-

ing attorney fees, incurred as a result of the removal," that they incurred in preparing the motion to remand, motion to stay and the first set of responses in opposition to the Teledyne and Cirrus defendants' respective motions to dismiss.[27]  Given both defendants' active involvement in this matter, they will share equally in the division of these fees and costs.

## ORDER

AND NOW, this 6th day of December, 2011, upon consideration of defendants Continental Motors, Inc., Teledyne Technologies Incorporated,[1] TRY Industries, Inc., and Allegheny Technologies Incorporated's (collectively, the "Teledyne defendants") notice of removal (docket entry # 1), plaintiffs Jack Yelled, Dana Moffett, Cynthia J. Tobin, Daniel Bozeman and Lesley Bozeman's (collectively, the "plaintiffs") motion to remand to state court (docket entry # 15), plaintiffs' motion to stay (docket entry # 21), defendants Cirrus Design Corp., Cirrus Aircraft Corp., and Cirrus Industries's (collectively, the "Cirrus defendants") response in opposition to remand (docket entry # 22), the Teledyne defendants' motion to dismiss the amended complaint (docket entry # 23), the Teledyne defendants' response in opposition to remand (docket entries ## 25–26), the Cirrus defendants' motion to dismiss the amended complaint (docket entry # 27), the Teledyne defendants' response in opposition to the motion to stay (docket entry # 28), the Cirrus defendants' response in opposition to the motion to stay (docket entry # 29), plaintiffs' motion

---

**27.** Ordinarily, we would limit fee-shifting to the reasonable legal services incurred solely in connection with the motion to remand. But here, where the first motion to dismiss was filed seven days after removal, plaintiffs had to respond on pain of our treating the Rule 12 motions as unopposed under our Local R. Civ. P. 7.1(c). Thus, those expenses were bound up with defendants' improvident removal. The amended complaint and services associated with it are, however, another matter that we will not encompass in the fee-shifting.

**1.** The caption on the docket incorrectly spells "Teledyne".

510

for leave to file reply in support of their motion to remand (docket entry # 30), the Teledyne defendants' response in opposition thereto (docket entry # 32), plaintiffs' response in opposition to the motion to dismiss (docket entry # 34), the Teledyne defendants' motion for leave to file reply in support of motion to dismiss the amended complaint (docket entry # 36), the Cirrus defendants' motion for leave to file reply in support of motion to dismiss the amended complaint (docket entry # 37), plaintiffs' response in opposition to motion for leave to file reply in support of motion to dismiss the amended complaint (docket entry # 38), and in accordance with the accompanying Memorandum and the Court also finding that additional replies were unnecessary to decide this remand question, it is hereby ORDERED that:

1. Plaintiffs' motion to remand (docket entry # 15) is GRANTED;

2. This case is REMANDED to the Court Common Pleas of Philadelphia County, Pennsylvania;

3. By December 13, 2011, Plaintiffs shall FILE a fee petition accounting for "just costs and any actual expenses, including attorney fees, incurred as a result of the removal," supported by the requisite billing and expense records, and clearly itemizing the costs and fees incurred in preparing the motion to remand, motion to stay, and the first set of responses in opposition to the Teledyne and Cirrus defendants' respective motions to dismiss, with the Teledyne defendants and Cirrus defendants' separate responses to the fee petition due by December 20, 2011;

4. Plaintiffs' motion to stay (docket entry # 21) is DENIED AS MOOT;

5. The Teledyne defendants' motion to dismiss the amended complaint (docket entry # 23) is DENIED AS MOOT;

6. The Cirrus defendants' motion to dismiss the amended complaint (docket entry # 27) is DENIED AS MOOT;

7. Plaintiffs' motion for leave to file reply in support of plaintiffs' motion to remand (docket entry # 30) is DENIED;

8. The Teledyne defendants' motion for leave to file reply in support of motion to dismiss the amended complaint (docket entry # 36) is DENIED AS MOOT;

9. The Cirrus defendants' motion for leave to file reply in support of motion to dismiss the amended complaint (docket entry # 37) is DENIED AS MOOT; and

10. The Clerk of Court shall CLOSE this case statistically.